# SMITH *v.* SMITH.

# SMITH *v.* SMITH.

# SMITH *v.* ANDERSON.

PATENTS; INTERFERENCE; BURDEN OF PROOF.

1. The burden is on the junior applicant in interference to overcome the presumption of priority that attaches to the senior applicant from the fact of his earlier filing date.

2. In an interference case involving the invention of a safety device for elevators, in which the junior party testified that he disclosed the invention of the issue to the senior party, and that, on the strength of the information so derived, the senior party, shortly after the alleged disclosure, filed his application; and the senior party contradicted such testimony, and testified that he disclosed the invention to the junior party, which resulted in the latter's application; and neither party was directly corroborated,—this court held, *affirming* a decision of the Commissioner of Patents, that, in view of the testimony and the surrounding circumstances and the conduct of the parties, that as to the invention of the issue the senior party was not the original inventor, but derived his knowledge thereof from the junior party, who was entitled to an award of priority.

3. Where one of the parties to an interference is shown to have fully completed his drawings for the Patent Office prior to the earliest date fixed by the other party, he is entitled to an award of priority.

Nos. 494, 495 and 496. Patent Appeals. Submitted May 15, 1908. Decided June 2, 1908.

HEARING on three appeals from a decision of the Commissioner of Patents in interference proceedings. *Affirmed.*

The facts are stated in the opinion.

*Mr. Frank T. Brown, Mr. Francis A. Hopkins,* and *Mr. Charles M. Nissen* for the appellant.

*Mr. Alan M. Johnson* for the appellees.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

These are appeals from decisions of the Commissioner of Patents in interference proceedings. The cases were argued together, and will be so considered in this opinion. The subject-matter of the interference is a safety device for elevators. In No. 494 judgment was rendered by the Commissioner in favor of Patrick F. Foley as to all counts, excepting count 4, which was found to be covered by a former patent. From this decision, neither R. C. Smith nor Anderson have appealed. Foley has not appealed from the rejection of the claims embraced in count 4. Hence the real parties in No. 494 are Foley and E. A. Smith. In No. 495, the Commissioner gave judgment in favor of Foley, except as to counts 6 and 7, on which judgment was rendered in favor of E. A. Smith. R. C. Smith has not perfected any appeal in this case. Neither has Foley appealed from the judgment rendered in favor of E. A. Smith as to counts 6 and 7. Hence the issue in this case is narrowed to Foley and Smith as to all counts involved, excepting counts 6 and 7. In No. 496 the Commissioner gave judgment in favor of Anderson, and from this decision E. A. Smith has appealed.

As to the parties involved in this controversy, E. A. Smith filed his application on February 6, 1905; J. N. Anderson's application was filed February 17, 1905, and P. F. Foley filed February 17, 1905.

Originally the issue in case No. 494 involved seventeen counts; in No. 495 ten counts; and in No. 496 two counts. The twenty-six counts covered in different phraseology the same matter, and the issue here involved is embraced in the following counts:

The issue in No. 494:

"1. An elevator car, a clamping device therefor, and a differ-

ential screw having a high pitch thread and a low pitch thread for actuating the clamping device.

"2. An elevator car, a clamping device therefor, a high pitch screw and a low pitch screw, said screws arranged to actuate the clamping device."

"9. In a safety device for elevators, the combination of a car, guides over which said car is adapted to run, a clamping device on the car, a high pitch screw arranged to move the clamping device against the guides, a low pitch screw arranged to tighten the clamping device on the guides, and means for actuating the screws by the motion of the car."

"11. The combination with an elevator car, guides over which the car is adapted to move, a clamping device on the car, a high pitch screw arranged to move the clamping device against the guides, a low pitch screw arranged to tighten the clamping device on the guides, and a governor connected to be run by the car, and arranged to actuate the screws when the speed of the car reaches a predetermined limit."

"17. In an elevator safety device, the combination of a car, guides therefor, clamping devices adapted to engage the guides, right- and left-hand screws arranged to move the clamping devices quickly against the guides, right- and left-hand screws of low pitch arranged to tighten the clamping devices on the guides, and means for actuating the screws by the movement of the car."

The issue in No. 495:

"1. In an elevator safety device, the combination with hoistway rails, of friction members adapted to engage said rails, a shaft having portions provided with threads of the same kind or direction but of different pitch, means connecting said threaded portions to said friction members, and means for automatically rotating the shaft."

"10. In an elevator safety device, the combination of a car, guides therefor, clamping devices adapted to engage the guides, right and left-hand screws arranged to move the clamping devices quickly against the guides, right- and left-hand screws of low pitch arranged to tighten the clamping devices on the

guides, a governor arranged to actuate the screws when the speed of the car reaches a predetermined limit, and means for actuating the screws by hand."

The issue in No. 496:

"1. A safety device for elevators, comprising a drum, a safety rope for turning the drum, brakes, members connected with the drum, rods for operating the brakes, said rods being connected with the members to move endwise, and means for first imparting a bodily endwise movement to the members and rods so as to apply the brakes quickly on rotating the drum, and, subsequently, rotating said members in unison with the drum to impart endwise movement to the rods for actuating the brakes slowly and more powerfully.

"2. A safety device for elevators, comprising a drum, a safety rope, the ends of which are secured to the drum, brake levers, members on which the drum is journaled, rods having heads at their outer ends for operating the brake levers, said rods being carried by the members and connected therewith to move endwise, and means for first imparting a bodily endwise movement to the members and rods to apply the brakes quickly on rotating the drum, and subsequently rotating the said members in unison with the drum to impart endwise movement to the rods for actuating the brake levers slowly and more powerfully."

The invention here in controversy is described in the opinion of the Commissioner of Patents as follows: "The subject-matter of the interference is a safety device for elevators; and while the devices of the respective parties are different, each is designed to overcome certain defects alleged to exist in what was known as the Ellithorpe safety. In this device there are mounted on the car clamping jaws in position to grasp the guide rails at either side of the elevator shaft. These jaws are located on the outer ends of levers pivoted intermediate their length and provided on their inner ends with means adapted to engage actuating cams. These cams are capable of movement in and out between said inner ends of the levers, and by this movement swinging the levers to bring the jaws into engagement with the

guide rails. In order to effect this movement of the cams, they are mounted on the outer ends of shafts which are threaded on their inner ends. These threads, which are of reverse kind for the opposite sides of the car, work in corresponding threads in opposite sides of a drum capable of being turned by the governor rope. This rope is attached to the drum, and, after a number of turns around it, passes to the top of the shaft, over a pully geared to the governor, and then to the bottom of the shaft, around another pulley and back to the car. This rope normally travels as the car does, and so the drum on the car is stationary. But if the car attains too high a velocity, the governor acts to grasp the rope, holding it stationary and thus unwinding it from the drum. This causes the drum to rotate, moves the screw shaft and its attached cams longitudinally, and imparts movement to the jaws which grasp the rail, thereby stopping the movement of the car. The invention of each of the parties to the interference is designed to move the jaws quickly until they come into contact with the rails, and then move them more slowly but more powerfully to force them tightly against the rails, and thus bring the car to a stop."

The issue before us in Nos. 494 and 495 is practically narrowed to a controversy between the applicants Patrick F. Foley and E. A. Smith. A consideration of the respective claims of these two parties, with a later reference to the claims of Anderson, will be sufficient for the purposes of this inquiry. Foley is the junior applicant, and the burden rests upon him to overcome the presumption of priority that attaches to Smith from the fact of his earlier filing date. There is a decided conflict in the evidence. Foley testifies that he disclosed the invention to Smith, and that, on the strength of the information so derived, Smith, shortly after the alleged disclosure, filed his application in the Patent Office. Smith in turn testifies that he disclosed the invention to Foley, which resulted in Foley's application. As to this evidence, neither of the parties is directly corroborated; and if we were confined to this evidence alone, Foley, being the junior applicant, would fail.

All three of the tribunals of the Patent Office have discredit-

ed Smith's testimony, and have found upon the facts in favor of
Foley. The Examiner of Interferences found for Smith on the
following ground: "In the view of the matter taken, it is held
that Foley is the first and original inventor of count 4 of the
issue; that he disclosed the invention covered by this count to
E. A. Smith on January 6, 1905; that Foley has produced no
evidence tending to show that prior to the filing of E. A. Smith's
application he was in possession of the specific invention cov-
ered by the remaining counts of the issue, and that therefore his
evidence is insufficient to prove that he could or did disclose this
more specific form to E. A. Smith; that the applications of
Foley, Anderson, and R. C. Smith disclose no mechanism on
which claims corresponding to counts 1 to 3 and 5 to 17, in-
clusive, of the issue, could be based; and therefore said appli-
cations do not constitute a constructive reduction to practice of
said counts 1 to 3 and 5 to 17, inclusive."

The Examiners-in-Chief, in reversing the Examiner of Inter-
ferences on the technical ground above stated, said: "If E. A.
Smith desired to raise this question of the lack of the other par-
ties' right to make the claim, it should have been raised by mo-
tion to dissolve at the proper time. Had it been so raised, the
other parties to this interference would have been enabled to so
amend their claims as to bring out the common patentable sub-
ject-matter in the applications, and not be brought together
only on one common issue, count 4, which, as will be stated
later, is, in our opinion, not patentable."

In an able opinion, the Commissioner of Patents affirmed
the decision of the Examiners-in-Chief. As to Smith's failure
to file a motion to dissolve the interference, the Commissioner in
his opinion said: "E. A. Smith did not bring a motion to dis-
solve the interference on the ground that the other parties had
no right to make the claims, and, as no showing was made why
such motion was not brought, he is not entitled to urge this ques-
tion under the provisions of Rule 130. The fact that no such
motion has been made does not prevent the tribunals of the
Office from considering the question of their own motion when
it clearly appears that one or more of the parties have no

right to make the claims corresponding to some or all of the counts of the issue. Where, however, no such motion was made, and the parties have, during the whole procedure of the case, acquiesced in the position taken by the Primary Examiner in declaring the interference, a decision should be rendered that certain of the parties are not entitled to make the claims, only in a clear case where there can be no doubt on the question. No such case exists here. R. C. Smith, Foley, and Anderson each shows a spiral cam which, as stated by the Examiners-in-Chief, is in effect a mutilated screw thread."

After reviewing the facts relative to the alleged disclosure of the invention by Smith and Foley, each to the other, the Commissioner admirably reviews the evidence as follows: "As there is no direct corroboration of either of these stories, it will be necessary to consider the testimony offered to show that the parties were in possession of the invention prior to the time of their alleged disclosures, and the conduct of the parties, and the surrounding circumstances. Foley claims to have first devised a means for moving the clamp of an elevator safety at two speeds in 1888, to have made a drawing at that time, and to have made various drawings showing different forms of the device subsequently to that time. He has placed in evidence six drawings, which are designated 'May, 1888, Drawing,' 'July, 1893, Drawing,' 'November, 1895, Drawing,' 'March 14, 1899, Drawing,' 'February, 1903, Drawing,' and 'Working Drawings, Sheets 1, 2, 3, 4, and 5.' The Examiner of Interferences has fully discussed the testimony of Foley and the witnesses to whom these drawings were shown and by whom they were signed, and it is not deemed necessary to repeat that discussion here. It is sufficient to say that the testimony clearly shows that Foley was in possession of the invention in issue as early as 1896. The hand-operated feature which appears in his application is first shown in the 1903 drawing. It is also shown in the working drawings, which are alleged to have been made in 1904. As to these dates there is no sufficient corroborating evidence. It is stipulated, however, that the working drawings were taken to Munn & Company by Foley on January 27, 1905,

and his application prepared therefrom. E. A. Smith claims to have conceived the invention in issue in 1897, and to have disclosed it at that time to Lindstrom and Mason, superintendent and chief draftsman, respectively, of the A. B. See Elevator Company, by whom he was employed, to have made a sketch of the invention in 1902, and to have at that time explained the invention to Miss Constance Wack and to Frank Zittel, and to have made another sketch on January 27, 1905, which he used in explaining on that day the invention to Marshall, his attorney by whom the application was prepared. Of the two persons to whom Smith claims to have disclosed his invention in 1897, only Mason is called as a witness. He testifies that in 1897, which date he fixes by reference to the time when he and E. A. Smith were employed by the A. B. See Elevator Company, the latter explained to him how he would use a high pitch and a low pitch screw to move the jaws of an Ellithorpe safety, first quickly and then more slowly but more powerfully. Mason admits, however, that he is testifying solely from memory as to a disclosure alleged to have been made to him nine years previously. His account of what Smith disclosed to him is given in very general terms, for he states that he cannot recall the details of the invention. He also admits that, although many improvements in elevator safeties were called to his attention while he was employed by the A. B. See Elevator Company, the only one that he can remember is this one of E. A. Smith. In view of these admissions his testimony is clearly insufficient to corroborate Smith's claim that he was in possession of the invention at this time. Smith has introduced in evidence the sketch alleged to have been made in 1902. It bears the signatures Edward A. Smith and Frank Zittel, and is dated September 29, 1902. The sketch is badly mutilated, a considerable portion of it having been torn away. The showing of the remaining part is only diagrammatic, and utterly insufficient by itself to form a disclosure of the invention, though E. A. Smith points out the portion thereof which was intended to show two screws. The condition of the sketch renders it suspicious, and Smith's explanation that it was torn because some

grease fell ·on it while he was comparing it with an Otis safety
on an elevator car is far from convincing, both because it is not
apparent why Smith, who was thoroughly familiar with the
construction of the Otis safety, should have wanted to compare
the sketch with an actual safety, and because the spots on the
remaining parts appear to have been made by graphite or some
other very heavy lubricant, and there is no indication of any
tendency of this to spread. The testimony of Zittel, who signed
the sketch, is not sufficient to corroborate Smith. Zittel admits
that he cannot read mechanical drawings, and the sketch is use-
ful to him only in recalling the verbal disclosure made to him
by Smith. He is therefore testifying solely from memory as to
the disclosure, four years after it is alleged to have been made
and after he had frequently discussed the matter with Smith.
His statement, moreover, of what Smith disclosed to him, does
not include all the details of the device. Marshall fully cor-
roborates Smith as to the disclosure made to him on January
27, 1905, and this is the earliest date of possession that can be
awarded to Smith. While, as pointed out above, there is no
direct testimony corroborating the testimony of either Foley or
Smith as to his alleged disclosure to the other, there are several
circumstances which tend to corroborate Foley's testimony. In
the first place, E. A. Smith's testimony is discredited not only
by reason of the 1902 sketch and his explanation with respect
thereto, but by reason of two other exhibits. The first of these
is Smith's note book, in which appear two entries with respect
to the present controversy. The first entry relates to Smith's
alleged disclosure to Foley on January 24, 1905, and the second
to the date when Smith says Foley told him that he had applied
for patent. These entries, which are the only ones relating to
the controversy or to Smith's alleged invention that appear in
the book, are not placed where they would have been if they had
been made on the dates in question. They appear neither in
the space allotted to the days on which they are alleged to have
occurred, nor directly below such space, where they would be if
the space was filled by other matter, but are entered, one in a
space left blank by Sunday, and the other on the margin. The

other exhibit is a printed copy of the regulation above referred to, which bears in Smith's handwriting the following entry:

> " 'January 26, 1905.
>
> " '1st information received from Mr. Boyhan as to the exact operation of the law.                    E. A. Smith.'

"Smith testifies positively that the entry was made on the date which it bears. In rebuttal, Foley called certain of the officials of the building department and several of the employees of the Brown Company, by whom the regulation was printed, and their testimony shows that it was impossible for Smith to have obtained a printed copy of the regulation earlier than February 21, 1905. Boyhan, who was chief elevator inspector, testifies that Foley disclosed the invention in issue to him in the latter part of December, 1904, or early part of January, 1905, and that the day after the test at the Times Building, on January 6, 1905, Foley told him that he (Foley) had explained the invention to E. A. Smith, and that he told Foley he thought he was making a mistake in disclosing his invention to outsiders. The conduct of Foley and E. A. Smith was in marked contrast. Foley made no special haste in filing his application after the promulgation of the building department order. Three days after Smith's alleged disclosure to him he took to this attorney several sheets of well-worked-out drawings. He told Smith of the fact that he filed his application, and informed him of the progress of the prosecution thereof. E. A. Smith, on the other hand, three days after his second interview with Foley, went to Marshall with a crude sketch, and after a hasty interview instructed him to file an application as soon as possible, since he believed that Foley intended to steal his invention. The only reason he could give for that belief was that when he told Foley of his invention the latter seemed surprised and opened his eyes very wide. Smith said nothing to Foley about having filed an application, and it was not until the interference was declared that Foley learned that this application had been filed. Foley states that the first time he met Smith after receiving the notice of the interference was at a test at the store of Stern

Brothers, and that he then told Smith in exceedingly plain language what he thought of him. Miller, the engineer at Stern Brothers, states that Foley and Smith had a heated interview on the day of the test, and, while he was not near enough to them to hear what was said, Foley told him, about half an hour afterwards, that the loud conversation was due to the fact that Smith 'had infringed on the elevator apparatus which he had invented.' In view of the testimony, and the surrounding circumstances of the case, and the conduct of the parties, it is held that as to the common subject-matter of the two cases E. A. Smith was not an original inventor, but derived his knowledge thereof from Foley."

As to No. 496, E. A. Smith's earliest date having been fixed at January 27, 1905, there is no difficulty in disposing of this controversy. The record clearly discloses that Anderson, on January 30, 1905, took his drawings, which fully disclose the invention in issue, to Munn & Company, and that his application was prepared therefrom. Anderson is corroborated as to a disclosure of the invention as early as December, 1903; but, discarding this evidence, it clearly appears that he was preparing the drawings which were taken to Munn & Company, and had them fully completed, prior to January 27, 1905, Smith's earliest date.

The record in this case is a voluminous one. We have examined the evidence called to our attention in the briefs of the respective parties with care, and can find no possible reason for disturbing the judgments of the Commissioner of Patents.

The decisions of the Commissioner in the respective cases are affirmed, and the clerk is directed to certify these proceedings, as by law required. *Affirmed.*